**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>LAMONT NELSON,<br><br>　　　　　　Defendant. | Crim. Action No. 21-613 (SDW)<br><br>**OPINION**<br><br>October 3, 2022 |

**WIGENTON**, District Judge.

Before this Court is Defendant Lamont Nelson's ("Nelson" or "Defendant") Motion to Suppress Evidence (the "Motion") pursuant to Federal Rule of Criminal Procedure 12(b)(3)(C). For the reasons discussed below, the Motion is **GRANTED**.

**I.　　FACTUAL AND PROCEDURAL BACKGROUND**

In the early afternoon of October 8, 2020, Newark Police Department Detectives Michael DaSilva and Christopher Serrano ("Detectives") "were traveling in an unmarked, unconventional vehicle on Seventh Avenue in Newark" when they noticed Defendant, "a black man, walking on the sidewalk on the opposite side of the street with headphones [on]." (D.E. 20 at 4, 6; *see also* D.E. 22 at 5; D.E. 29 ("Tr.") 14:6–9, 16:18–25, 17:18–25, 18:1–4, 21:12–16.)[1] The Detectives were patrolling the area near Branch Brook Park after there had been "[n]umerous complaints of individuals buying and selling narcotics in that area" and a recent "aggravated assault shooting"

---

[1] All page citations to briefs will cite the D.E. page number.

in the area two days prior, which constituted a "recent uptick in criminal activity in the area." (Tr. 11:19–22, 13:17–24; D.E. 22 at 4, 11; *see also* D.E. 22-3 at 2–3.) Detective DaSilva considered the patrol area a "high crime area." (Tr. 14:3–5.)

As the Detectives drove toward Defendant, they observed him startle, "widen his eyes, becom[e] fixated" on the car in which they were travelling, and "grab[] his black shoulder bag[,] which was strapped across his chest." (D.E. 20 at 6 (quoting D.E. 20-1 at 3); *see also* D.E. 22 at 5.) After passing by Defendant, the Detectives turned the car around, pulled next to Defendant, parked, and got out of the car. (D.E. 20 at 6–7; D.E. 22 at 5.) Defendant stopped and Detectives identified themselves as Newark Police. (D.E. 20 at 7; *see also* D.E. 22 at 6.) Defendant grabbed his bag and Detective DaSilva grabbed Defendant's hand and told him not to reach inside the bag. (D.E. 20 at 7; D.E. 22 at 6.) The Detectives observed that the bag was unzipped, and Detective DaSilva contends that he "saw the handle of a firearm." (D.E. 22 at 6; *see also* D.E. 20 at 7–8.) The Detectives searched Defendant's bag and found a firearm, ammunition, suspected marijuana, and clothing items. (D.E. 20 at 5–6; D.E. 22 at 4.)

Defendant was arrested on the scene and charged with unlawful possession of a weapon, in violation of N.J. Stat. Ann. § 2C:39-5B, and unlawful possession of a controlled substance, in violation of N.J. Stat. Ann. § 2C:35-10A. (D.E. 22 at 6.) On January 25, the Hon. Leda D. Wettre, U.S.M.J., authorized the filing of a criminal complaint pertaining to the firearm charge, and the State charges were then dismissed in favor of federal prosecution. (D.E. 20 at 8; D.E. 22 at 6.) On August 10, 2021, a federal grand jury indicted Defendant on one count of being in possession of a firearm and ammunition after previously being convicted of a felony, in violation of 18 U.S.C. § 922(g). (D.E. 20 at 8; D.E. 22 at 6–7.)

On February 11, 2022, Defendant filed the instant motion to suppress the evidence seized during the October 8, 2020 arrest.[2] (*See generally* D.E. 20.) Defendant contends that the search violated his Fourth Amendment rights because the Detectives lacked reasonable suspicion for an investigative stop, and the Detectives lacked probable cause to search his bag. (*See id.* at 4–5.) The Government filed an opposition and Defendant filed a reply. (*See generally* D.E. 22, 26.) An evidentiary hearing was held on June 15, 2022, (*see generally* D.E. 29), and the parties submitted supplemental briefs, (*see generally* D.E. 33, 34).

### A. Detective Michael DaSilva's Incident Report

The incident report, written by Detective DaSilva, describes the events leading to the seizure and search. (*See generally* D.E. 20-1 at 2–4; 22-1 at 2–4.)[3] A summary of the incident report follows.

The incident report states that on October 8, 2020, at approximately 1:13 p.m., Detectives DaSilva and Serrano were "traveling westbound on [Seventh] Avenue, approaching Clifton Ave[nue]" and "operating in an unconventional police vehicle and clad in civilian attire." (D.E. 22-1 at 3.) The Detectives saw Defendant walking toward them on the sidewalk next to the opposite side of the road, and noticed that he "immediately became startled of our police presence, specifically by widen[ing] his eyes and becoming fixated to our police vehicle." (*Id.*) Detective DaSilva saw Defendant "grab[] his black shoulder bag[,] which was strapped across his chest," and told Detective Serrano what he had seen. (*Id.*)

---

[2] Defendant's motion also included Omnibus pretrial motions concerning discovery. This Opinion addresses only the pending Motion to Suppress.

[3] Both parties included the same incident report with their briefs. For simplicity, this account will cite only one copy of the report.

Detective Serrano made a U-turn and parked next to Defendant. (*Id.*) The Detectives got out of the unmarked car and Detective DaSilva saw Defendant grab his bag as they approached and told Defendant that they were Newark Police Officers. (*Id.*) Defendant then reached inside his bag and Detective DaSilva grabbed his hand and told him not to reach inside the bag. (*Id.*) Detective DaSilva "looked inside the unzipped black shoulder bag," he saw "a black handle of a firearm," which was later identified as a "brown .32 Colt Pocket Positive Revolver, . . . loaded with [six] ball[-]point rounds[,] with a black handle." (*Id.*) Detective DaSilva alerted Detective Serrano and placed Defendant under arrest. (*Id.*) During the arrest, in addition to the loaded revolver, the Detectives located suspected marijuana on Defendant's person. (*Id.*)

### B. Evidentiary Hearing

This Court held an evidentiary hearing at which Detective DaSilva testified. According to Detective DaSilva's testimony, on October 8, 2020, the Detectives were assigned to patrol a grid "from Park Avenue to Seventh Avenue, Broadway, . . . to Clifton Avenue" in an effort to "suppress crime in that immediate area, conduct motor vehicle stops when warranted, [and] conduct pedestrian stops when warranted." (Tr. 12:13–24, 14:6–21.) The Detectives were not looking for a particular suspect and did not have reports about Defendant or someone matching his description committing any crimes. (Tr. 37:8–25, 38:1–15.) During their patrol, the Detectives wore civilian clothes in an effort to blend in, and Detective Serrano wore a bullet-proof vest, but the Detectives did not don body-worn cameras.[4] (Tr. 14:23–25, 15:1–25, 16:1–16; 49:22–25, 50:1–13.) Detective Serrano drove an unconventional, unmarked green Audi sedan with tinted windows, which Detective DaSilva described as "just a regular vehicle that you and I drive. It has no letterings of 'Newark Police' at all[,]" and Detective DaSilva observed their surroundings from

---

[4] Detective DaSilva clarified that body-worn cameras were not yet required equipment. (*See* Tr. 17:24–25, 18:1–6.)

the passenger's seat. (Tr. 16:17–25, 17:1–4; 18:7–16, 38:19–25, 40:1–6, 49:9–12, 75:8–10.) The sedan had a police light bar on the windshield and a siren, but no dash cam. (Tr. 17:5–23.) Detective DaSilva testified that the windows on the sedan were lowered so that he could listen for shots fired, shouts concerning police presence, or cries for help. (Tr. 18:17–25, 19:16.) It was light and sunny outside, with sun and shade from trees on the street, and the weather was clear that day. (Tr. 19:17–21, 71:15–16.)

Detective DaSilva stated that the sedan was travelling at approximately 15 to 20 miles per hour when he first saw Defendant walking on the sidewalk on the opposite side of the street, headed eastbound toward them. (Tr. 20:23–25, 21:1–16, 42:21–25, 79:23–25, 80:1–2.) Defendant was wearing "all black clothing and he had a shoulder bag[,] which was strapped across the middle of his chest."[5] (Tr. 21:23–25, 22:1, 68:4–25, 69:1–8.) He also had a COVID mask on and a "skully cap," with "little holes on [it]," which enables one to "put it over [the] face . . . ." (Tr. 44:18–25, 45:1–17.) According to Detective DaSilva, Defendant, who was about ten feet away when the Detective first saw him, "became startled of [their] police presence by widening his eyes." (Tr. 21:17–19; 22:9–11, 38:17–18; 39:18–22, 69:9–11, 71:12–14.) Detective DaSilva stated that Defendant then "became fixated towards our unconventional police vehicle," meaning he was "tracking" them and "turning his head while watching [their] vehicle." (Tr. 22:9–25, 38:19–25, 39:9–10, 65:2–21.) Defendant, according to Detective DaSilva, then "grabbed his shoulder bag that was strapped across his chest." (Tr. 23:4–7, 39:1–2, 53:22–25, 54:1–11.) Detective DaSilva testified that he interpreted Defendant's startled reaction and grabbing of the bag as nervousness, believed Defendant recognized their vehicle as a police vehicle, and suspected that Defendant

---

[5] Detective DaSilva demonstrated that the bag was situated with the pouch of the bag resting on Defendant's chest and stomach. (Tr. 53:1–14, 54:1–2.)

5

"may be in possession of a firearm." (Tr. 23:8–25, 24:1–25, 25:1–14, 39:3–10, 54:22–24, 65:22–25, 66:17.)

On cross examination, Detective DaSilva was questioned about whether Defendant's actions—widening his eyes, looking toward the sedan, and touching his bag—prompted the Detective to have "a hunch that [Defendant] was up to something[,]" to which he replied: "In the report there is more than that. We need more than that." (Tr. 38:17–25, 39:1–8.) Detective DaSilva was later asked to confirm that "it[] [i]s not a crime to open one's eyes," "it[] [i]s not a crime to widen one's eyes," "it[] [i]s not a crime to look at a car that's driving by," and "it[] [i]s not a crime to touch a bag," to which he replied to each individual question that "you need more" or "you need more than that." (Tr. 72:12–19, 72:12–14.)

After seeing Defendant on the street, Detective DaSilva told Detective Serrano to perform a U-turn so they could investigate Defendant's "suspicious behavior." (Tr. 25:15–20, 40:19–25, 54:12–24, 55:25.) Detective DaSilva testified that they pulled up and parked in the parking lane alongside Defendant, and both Detectives got out of the car and approached Defendant, who stopped walking. (Tr. 25:21–25, 26:1–20, 40:7–25, 55:5–15, 56:18–20, 67:4–9. 69:12–25, 70:1–25, 71:1–4.) While the Detectives approached, Detective DaSilva testified, he saw Defendant "grab his shoulder bag." (Tr. 26:7–10, 55:20–22.) Detective DaSilva said, "Newark Police," and then Defendant reached his hand inside his unzipped shoulder bag. (Tr. 26:21–25, 27:1–25, 55:12–13, 56:5–7, 56:14–17, 63:20–22.) Detective DaSilva grabbed Defendant's right hand and took it away from the bag, and said, "Do not reach into the bag." (Tr. 28:1–11.) Detective DaSilva testified that he then looked into the bag—which was black inside—and "observed the black handle of a firearm." (Tr. 28:13–17, 62:11–12, 62:13–19, 64:1–15.) Detective DaSilva told Detective Serrano—who was standing next to him during the exchange—the police code for a

6

firearm. (Tr. 29:6–23.) The Detectives then placed Defendant under arrest, handcuffed him, removed his shoulder bag from across his chest, retrieved the loaded firearm, searched the bag, searched Defendant's person, and found suspected marijuana in Defendant's pocket. (Tr. 30:1–20, 35:22–25, 36:15.)

## II. DISCUSSION

### A. Applicable Law

"The Fourth Amendment protects individuals from 'unreasonable searches and seizures' of 'their persons, houses, papers, and effects.'" *United States v. Crandell*, 554 F.3d 79, 83 (3d Cir. 2009) (quoting U.S. CONST. amend. IV). "Warrantless searches and seizures are presumptively unreasonable and are therefore prohibited under the Fourth Amendment, unless an exception applies." *United States v. Hester*, 910 F.3d 78, 84 (3d Cir. 2018) (quoting *United States v. Mundy*, 621 F.3d 283, 287 (3d Cir. 2010)). "In *Terry* [*v. Ohio*], the Supreme Court set forth an exception that allows a police officer to conduct a 'brief, investigatory stop when the officer has [] reasonable, articulable suspicion that criminal activity is afoot.'" *United States v. Scott*, 816 F. App'x 732, 736 (3d Cir. 2020) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)); *see also Terry v. Ohio*, 392 U.S. 1, 27, 30–31 (1968). "Because this reasonable suspicion requirement is only triggered by a seizure, we first pinpoint the moment of the seizure and then determine whether that seizure was justified by reasonable, articulable facts known to [the officer] as of that time that indicated that [the suspect] was engaged in criminal activity." *Scott*, 816 F. App'x at 736 (alterations in original) (internal citations and quotations omitted). The Government has the initial burden to prove that a *Terry* stop is based on reasonable suspicion. *Wardlow*, 528 U.S. at 123–24. If the police acted without an appropriate basis for the *Terry* stop, the evidence obtained pursuant to that unconstitutional seizure "must be suppressed as 'fruit of the poisonous tree.'" *United States v.*

*Brown*, 448 F.3d 239, 244 (2006) (quoting *Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963)).

### B. Analysis

Defendant contends that Detectives DaSilva and Serrano seized him when they exited their vehicle and shouted at him, and that the officers did not have reasonable suspicion to execute the *Terry* stop, thus the fruits of any resulting search must be suppressed. (*See* D.E. 20 at 9–18; D.E. 34 at 8–17.) The Government argues that the seizure occurred when Detective DaSilva grabbed Defendant's hand and told him not to reach in the bag, and the totality of the facts and observations by the trained officers constituted reasonable suspicion for the *Terry* stop. (D.E. 22 at 7–15; D.E. 33 at 2–7.) The Government also asserts that the search after the seizure resulted from the gun handle being in plain view in the unzipped bag, thus the firearm evidence is admissible. (D.E. 22 at 15–18; D.E. 33 at 7–8.) There are two primary issues this Court must assess: (1) whether the Detectives' conduct qualified as a seizure, and, if so, the moment of that seizure; and (2) if a seizure occurred, whether the Detectives' conduct in stopping Defendant was undergirded by reasonable, articulable suspicion. *See United States v. De Castro*, 905 F.3d 676, 678 (3d Cir. 2018) (citing *United States v. Smith*, 575 F.3d 308, 313 (3d Cir. 2009)). For the reasons elucidated below, this Court finds that there was a seizure, and the seizure was not supported by reasonable, articulable suspicion.

1. <u>Seizure</u>

"A seizure occurs only 'when [a police officer], by means of physical force or show of authority, has in some way restrained the liberty of a citizen.'" *Crandell*, 554 F.3d at 84 (quoting *Terry*, 392 U.S. at 19–20 n.16); *see also Brendlin v. California*, 551 U.S. 249, 256 (2007). During a non-consensual stop, police authority rises to the level of a seizure only when a person's freedom

8

is restrained either (1) by application of physical force, even if it is ultimately unsuccessful; or (2) when a person submits to an assertion of authority. *California v. Hodari D.*, 499 U.S. 621, 626 (1991) (finding that because defendant did not comply with law enforcement's show of authority, he was not seized until he was restrained by physical force). "The 'show of authority' test 'is an objective one: not whether the citizen perceived that he [or she] was being ordered to restrict his [or her] movement, but whether the officer's words and actions would have conveyed that to a reasonable person' in light of all the surrounding circumstances." *Crandell*, 554 F.3d at 84–85 (quoting *Hodari D.*, 499 U.S. at 628). Several circumstances may indicate seizure, such as

> the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.

*Id.* at 85 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554–55 (1980)).

Here, it is clear that a physical seizure occurred when Detective DaSilva grabbed Defendant's arm. *See Hodari D.*, 499 U.S. at 626. However, this Court finds that a seizure occurred even before that moment. The Detectives, after executing a U-turn and parking next to Defendant, seized Defendant by a show of authority when they got out of their vehicle and identified themselves as police officers as they approached Defendant. (D.E. 22-1 at 3.) While it is true that "[a] seizure does not occur every time a police officer approaches someone to ask a few questions," *Johnson v. Campbell*, 332 F.3d 199, 205 (3d Cir. 2003), in this scenario, a reasonable person objectively viewing the circumstances—two officers (one of whom wore a bullet-proof vest) executing a mid-street U-turn, parking next to Defendant, getting out of the car, rapidly approaching and intercepting him and announcing that they are police as they approached him—

would consider the officers' actions a show of authority. That show of authority "would convey to a reasonable person that compliance was not optional." *Haberle v. Troxell*, 885 F.3d 171, 176 (2018) (citing *Mendenhall*, 446 U.S. at 555); *see also Florida v. Bostick*, 501 U.S. 429, 435–36 (1991) ("We have stated that even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual . . . as long as the police do not convey a message that compliance with their requests is required.") (internal citations omitted)).

Furthermore, Defendant's reaction to the officers' actions—stopping in his tracks and submitting to the approaching officers—demonstrates an understandable response to a show of authority. Tellingly, when Officer DaSilva was asked if he "did not want [Defendant] to continue walking" at the moment he approached Defendant and announced that he was with the Newark Police, the officer replied, "That[] [i]s correct. But he stopped on his own." (Tr. 56:8–9.) Officer DaSilva's admitted and evident intent to curtail Defendant's freedom of movement at that moment manifested in Defendant's correct discernment of the officer's intent, and Defendant's subsequent submission. *See United States v. Lowe*, 791 F.3d 424, 433 (3d Cir. 2015) ("[R]esponding to a show of authority by staying put is a means of passively submitting to that authority." (citing *Brendlin*, 551 U.S. at 262)).

Under this particular set of circumstances, no reasonable person would believe that Defendant was at liberty to continue walking or leave at the moment the Detectives approached from the unmarked police vehicle and announced themselves as officers. *See, e.g.*, *Haberle*, 885 F.3d at 176; *Lowe*, 791 F.3d at 433–34; *Brown*, 448 F.3d at 245–46. Therefore, a seizure occurred even prior to Detective DaSilva grabbing Defendant's arm. The authoritative approach, identifying announcement, and stop of Defendant, which prompted Defendant's attention,

10

cessation of movement, and submission to the authority, constituted a seizure under the Fourth Amendment.

### 2. Reasonable Articulable Suspicion

The next question to consider is: "Did the facts known to the officers at that moment of seizure give rise to reasonable suspicion?" *Lowe*, 791 F.3d at 431. For a seizure to be appropriate, the *Terry* stop must be based upon reasonable, articulable suspicion. *See Scott*, 816 F. App'x at 736. "Reasonable suspicion exists if an officer can 'articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity.'" *United States v. Torres*, 961 F.3d 618, 623 (2020) (quoting *Wardlow*, 528 U.S. at 123). Courts apply a "totality of the circumstances" test to assess whether an officer had a "'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). "In evaluating whether reasonable suspicion existed, a court 'must consider the totality of the circumstances, including the police officer's knowledge, experience, and common-sense judgments about human behavior.'" *United States v. Navedo*, 694 F.3d 463, 468 (3d Cir. 2012) (quoting *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002)). An officer's determination of reasonable suspicion receives "significant deference." *Torres*, 961 F.3d at 623 (quoting *United States v. Foster*, 891 F.3d 93, 104 (3d Cir. 2018)). At the same time, however, a court must discern "whether a reasonable, trained officer standing in [the officer's] shoes could articulate specific reasons justifying [the] detention." *United States v. McCants*, 952 F.3d 416, 422 (3d Cir. 2020) (alterations in original) (quoting *Brown*, 448 F.3d at 246–47).

Just prior to seizure, the Detectives were actively patrolling, while wearing civilian clothes and driving a vehicle designed to "blend in," and were tasked with conducting motor vehicle and pedestrian stops in what Detective DaSilva considered a "high crime area." (Tr. 14:3–5, 12:13–

11

24, 14:6–21, 50:6–13.) At the moment of seizure, Detective DaSilva had just observed the following actions by Defendant: As the green Audi sedan with tinted windows drove toward him, Defendant startled and widened his eyes, fixated on the sedan, and touched or grabbed his bag. (*See* Tr. 38:17–25, 39:1–24.) Additionally, Detective DaSilva observed that Defendant wore black, had a black bag across his chest, and wore a black hat and COVID mask. (Tr. 21:23–25, 22:1, 44:18–25, 45:1–17, 68:4–25, 69:1–8.) Detective DaSilva alleges that he was approximately ten feet away from Defendant in a vehicle going 15 to 20 miles per hour when he made these observations and decided that Defendant's behavior was suspicious and should be investigated. (Tr. 21:2–19; 54:22–24, 55:16–18.) That is the sum total of the factors that led the Detectives to believe they had reasonable suspicion to seize and subsequently search Defendant. As Detective DaSilva repeatedly stated during his testimony, however, *you need more than that*.

The reputation of an area for criminal activity can be used as support to justify a *Terry* stop; however, it cannot stand alone and must be combined with other factors. *See Brown v. Texas*, 443 U.S. 47, 52 (1979). Here, the Detectives allege, and Defendant disputes, the area is a high crime area. (Tr. 14:3–5; D.E. 20 at 16–17.) This Court makes no finding in this regard, but assuming, *arguendo*, that the Detectives are correct, such a determination would carry minimal weight. Importantly, the Detectives' suspicion of Defendant's involvement in criminal activity did not stem from a particular report about Defendant or anyone matching his description, and instead was based solely on Defendant's purported minor mannerisms, including startling and widening his eyes, fixating on the vehicle, and grabbing his bag. (*See* Tr. 38:17–25, 39:1–24.) For those actions to have been significant, Defendant would have had to have somehow immediately recognized that the green Audi—which was purposely unmarked and incognito—was in fact a police vehicle and discerned that the driver and passenger—who were dressed in civilian clothes to blend in—

12

were in fact police officers.  And, Defendant would have had to make those judgments and perform those actions long enough to arouse suspicion, as the vehicle was travelling at 15 to 20 miles per hour when Detective DaSilva saw Defendant startle and react at a purported mere ten feet away from him.  This distance and circumstance, however, is contradicted by the fact that Detective DaSilva was on the passenger side of the vehicle travelling on the right side of the road, and Defendant was walking on the sidewalk on the opposite side, which was situated across the opposing traffic lane and an additional empty parking lane.  Detective DaSilva confirmed that he "observed [Defendant] a little prior" to passing by him, and they "were[] [not] exactly even at the time [they] were going westbound.  [Detective DaSilva] observed him before [they] were even." (Tr. 42:23–25.)  This improbable scenario of the vehicle's movement and distance to Defendant suggests that the travel lane and parking lane would have to each be considerably less than five-feet wide,[6] especially when factoring in Defendant's diagonal, moving trajectory, and time would have had to proceed in slow motion for any possible meaningful fixation and movement.

      This Court cannot give significant weight to Detective DaSilva's testimony regarding Defendant's mannerisms of widening his eyes and fixating on the car in this improbable series of events, when the timing, distance, and significance of the actions is questionable at best.  It is difficult to imagine how long Defendant could have possibly "fixated" when Detective DaSilva testified that he was only ten feet away from Defendant and travelling in a vehicle presumably slowly down a sunny and shady street.  (Tr. 39:10–24, 43:14–16.)  That distance, speed, and movement would appear to preclude any meaningful fixation or action that would signal criminal

---

[6] The National Association of City Transportation Officials cites typical urban lane width as approximately ten feet. *Urban Street Design Guide*, NAT'L ASSOC. OF CITY TRANSP. OFFS., https://nacto.org/publication/urban-street-design-guide/street-design-elements/lane-width/#:~:text=Travel%20lane%20widths%20of%2010,lanes%20in%20the%20opposing%20direction (last visited Sept. 28, 2022) ("Travel lane widths of 10 feet generally provide adequate safety in urban settings while discouraging speeding.  Cities may choose to use 11-foot lanes on designated truck and bus routes (one 11-foot lane per direction) or adjacent to lanes in the opposing direction.").

13

activity was afoot.  Additionally, Detective DaSilva's report discusses Defendant's fixation toward the vehicle, but does not address Defendant turning his head—a detail Detective DaSilva later added in his testimony after confirming that the Detectives "need more than that" which he included in his report, to have reasonable suspicion of criminal activity.  (Tr. 39:7–8, 65:2–21.)

Further, even if Defendant absolutely did startle, widen his eyes, fixate, and grab his bag upon seeing the vehicle, those actions *still* do not amount to adequate reasonable suspicion.  It is possible to imagine a thousand scenarios in which a person might appear alarmed at an approaching car, but such alarm would not rise to a level constituting suspicious behavior.

The Fourth Amendment does not permit unreasonable searches and seizures, and the seizure in this instance was palpably unreasonable in that it was based on brief and minute actions that anyone might make while walking down the street.  While this Court recognizes the Detectives' experience in the field provided some basis of knowledge that likely raised interest in the Defendant, it cannot dismiss the fact that the minimal actions Defendant made while walking were simply not enough for the Detectives to make a U-turn and seize him to investigate.  The fact that Detective DaSilva repeatedly confirmed that "you need more than that" when asked about these specific actions suggests that the weakness of the suspicion was evident even to him.  (Tr.  72:12–19, 72:12–14.)  This Court finds that a "trained officer standing in [the officer's] shoes" in this particular set of circumstances would not be able to "articulate specific reasons justifying [the] detention."  *McCants*, 952 F.3d at 422 (alterations in original) (quoting *Brown*, 448 F.3d at 246–47).  This stop was evidently based on a hunch, *Torres*, 961 F.3d at 623, and the fact that the hunch eventually paid off is of no moment.  Persons must be able to walk freely down the street and not be subject to seizures and searches that stem solely from a hunch.  *See Brown*, 443 U.S. at 52 ("In the absence of any basis for suspecting [a defendant] of misconduct,

the balance between the public interest and [the defendant's] right to personal security and privacy tilts in favor of freedom from police interference.").

The Government failed to meet the burden of proving that this *Terry* stop was based on reasonable suspicion. *See Wardlow*, 528 U.S. at 123–24. Based on the factual record and the testimony elicited at the evidentiary hearing, this Court concludes that the Detectives did not have reasonable suspicion, based on specific and articulable facts, to conduct a *Terry* stop. Because the firearm was discovered during the unlawful *Terry* stop,[7] the Fourth Amendment requires that the evidence be suppressed. *See Brown*, 448 F.3d at 244.

### III.     CONCLUSION

For the reasons set forth above, Defendant's Motion to Suppress is **GRANTED**. An appropriate order follows.

s/ *Susan D. Wigenton*
**SUSAN D. WIGENTON**
UNITED STATES DISTRICT JUDGE

Orig:        Clerk
cc:          Parties

---

[7] Because the seizure occurred prior to the search, and the seizure itself was not based on reasonable articulable suspicion, this Court does not reach the Government's argument concerning the plain view doctrine, as it is moot. (*See* D.E. 22 at 15–18; D.E. 33 at 7–8.)